**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**CHRISTIAN D'ALLESSANDRO,**

                    **Plaintiff**

**vs.**                          **CASE NO. 04-CV-0788 (GTE-GJD)**

**CITY OF ALBANY; ROBERT WOLFGANG,**
**individually and in his official capacity;and**
**JOHN NIELSEN, individually and in his**
**official capacity**

                    **Defendants**

**G. THOMAS EISELE, SENIOR DISTRICT JUDGE, sitting by designation[1]**

**ORDER GRANTING SUMMARY JUDGMENT**

        Presently before the Court is the remaining due process issue in Defendants' Motion for

Summary Judgment.

**I.  BACKGROUND[2]**

        Plaintiff Christian D'Allessandro was hired by the Albany Police Department ("APD") in

1987.[3]  At all times relevant, Defendant John Nielsen was Commissioner of Public Safety for the

City of Albany and Defendant Robert Wolfgang was Chief of Police for the APD.[4]  Defendant

_____

        [1]The case was reassigned on April 27, 2006.

        [2]The Court provided a more extensive discussion of the facts of this case in the opinion
addressing Plaintiff's First Amendment retaliation, defamation, and breach of contract claims.
Therefore, the Court will only include those facts especially pertinent to the due process claim.

        [3]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ 3.

        [4]Plaintiff's Response to Defendants' Statement of Material Facts,  ¶ ¶ 1, 2.

1

Nielsen reported to the Mayor,[5] and Defendant Wolfgang reported to Defendant Nielsen.[6]

On January 21, 2004, Commander Tashjian sent an IDC to Defendant Wolfgang stating that Detective Anthony Ryan had informed him that he had found a flier, which was purported to be a parody of then Commander Ralph Tashjian, on a bulletin board in the traffic division.[7]  The IDC stated that the flier "contained derogatory remarks about [him] and also contained a photograph of an unknown male of mid-eastern descent which may be a reference to [his] heritage.  Detective Ryan further informed me that he was upset and pulled the memo from the wall and destroyed it."[8]  Defendant Nielsen directed Commander Reilly, Commander of the APD Office of Professional Standards ("OPS") to investigate the flier.[9]  The OPS commenced an investigation into this flier, and approximately 22 employees were interviewed.[10]  One of the fingerprints on the flier located on the wall of the South Station Lieutenant's locker room was that of Plaintiff.[11]  However, Lieutenant Timothy Close testified before OPS that he hung the flier in the Sergeant's and Lieutenant's locker room.[12]

---

[5]Exhibit FF, Nielsen Dep. p. 13, Defendants' Motion for Summary Judgment (hereafter "Defendants' Motion").

[6]Exhibit II, Wolfgang Dep. p. 9, Defendants' Motion.

[7]Exhibit J, 1/21/04 IDC from Tashjian, Defendants' Motion.

[8]Exhibit J, 1/21/04 IDC from Tashjian, Defendants' Motion.

[9]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ 38; Exhibit 78, Reilly Dep. p. 60, Plaintiff's Response.

[10]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ ¶ 41-42.

[11]Exhibits L and M, Defendants' Motion for Summary Judgment.

[12]Exhibit 26, Close OPS Testimony p. 3, Defendants' Motion.

On January 22, 2004, before OPS, Officer Robert Schunk, a subordinate officer to the Plaintiff, testified that during a conversation in the South Station Sergeant's locker room, the Plaintiff encouraged him "to make sure the other officers get to see this and that it doesn't get back to him."[13]  Officer Schunk testified that the did not distribute the flier.[14]  Specifically, Officer Schunk testified:

> I received the flyer from Cmdr. D'Alessandro at the South Station approximately a week and a half ago. . . . He actually told me that he wanted to show me something.  We went into the room off the South Station desk area, which is the Sergeant's locker room.  He produced the flyer and asked me if I could see that it got passed around and the other officers could view it. . . . I don't know the exact words, he said, make sure the other officers get to see this and that it doesn't get back to him.[15]

On January 23, 2004, Officer Schunk further testified that when Plaintiff told him that he had something to show him, "[t]he desk personnel would have been there."[16]  When asked if he recalled who that was, he stated, "Clerk Walker, I don't know who the police officer was on the desk."[17]  However, Officer Schunk stated that he did not "know if she was paying attention or what was going on really."[18]  Officer Schunk also stated that he expected to suffer repercussions from Plaintiff for his testimony.[19]  On January 23, 2004, Defendants suspended Plaintiff from his

---

[13]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ ¶ 45-47.

[14]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ ¶ 50, 54.

[15]Exhibit P, Schunk OPS Testimony p. 2, Defendants' Motion.

[16]Exhibit Q, Schunk 2nd OPS Testimony p. 2, Defendants' Motion.

[17]Exhibit Q, Schunk 2nd OPS Testimony p. 2, Defendants' Motion.

[18]Exhibit Q, Schunk 2nd OPS Testimony p. 2, Defendants' Motion.

[19]Exhibit P, Schunk OPS Testimony p. 4, Defendants' Motion.

position.[20]  On January 27, 2004, Commander Tashjian filed an incident report alleging

Aggravated Harassment regarding the flier, stating that "suspects unknown did create and

circulate a flier throughout the Albany Police Department that was derogatory in nature . . . ."[21]

Plaintiff admits that he gave the flier to Officer Schunk.[22]  However, during his testimony

before OPS on February 4, 2004, Plaintiff, who was represented by counsel, testified that he did

not tell Officer Schunk to distribute the flier.[23]  In his testimony before OPS, Plaintiff also

testified as follows:

> I was sitting in a chair across from the desk from the clerk in the South Station, in
> her office. . . . I was sitting in the Clerk's office going through my mail.  I opened
> up a folded piece of paper that was similar to this one here and I started to read it
> and I noticed somebody walked in.  I looked it was Officer Schunk.  I showed him
> the flier and asked him if he had any knowledge of this.  He smiled and said no.
> He didn't take the time to read it and it was my impression that it wasn't the first
> time he saw it.  I asked him if he had any idea who was responsible for it.  He
> shook his head and nodded in the affirmative.  I told him that I didn't want this
> showing up on bulletin boards, because I didn't want it coming back to me.  With
> that he left.[24]

Plaintiff testified that he was seated in the chair in front of the clerk's desk at South Station when

he showed the document to Officer Schunk, and that Jen Teller, the clerk, was present.[25]  On

---

[20]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ 60.

[21]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ 40; Exhibit K, Defendants' Motion.

[22]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ ¶ 50, 54.

[23]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ ¶ 55, 59.

[24]Exhibit U, D'Alessandro OPS Testimony p. 3, Defendants' Motion.

[25]Exhibit U, D'Alessandro OPS Testimony p.6 , Defendants' Motion.

February 4, 2004, Ms. Teller testified before OPS that she did not recall a time where Plaintiff had a conversation with Officer Schunk in her office.[26]

Defendant Wolfgang testified that he made the decision to terminate Plaintiff "in consult with" Defendant Nielsen on February 4, 2004, sometime in the afternoon.[27]  Defendant Nielsen states that the decision to terminate Plaintiff was Defendant Wolfgang's, but he was "supportive" of it.[28]  However, both Defendants admit that they "personally participated in the decision to terminate plaintiff's employment."[29]  Commander Reilly testified that he did not make any recommendation that Plaintiff should be terminated.[30]  However, he testified that he told Chief Wolfgang that he believed that Plaintiff "was being deceptive in his interview" and was "lying" during the interview.[31]

In an IDC dated February 5, 2004,[32] Commander Reilly detailed his attempts to "relay an order" from Chief Wolfgang to Plaintiff to report to the APD's Office of Professional Standards.[33]  Commander Reilly stated that on February 4, 2004, at about 3:00 p.m., he was

---

[26]Exhibit V, Teller OPS Testimony p. 2, Defendants' Motion.

[27]Exhibit 71, Wolfgang Dep. p. 118, 122-23, Plaintiff's Response.

[28]Exhibit FF, Nielsen Dep. p. 152-53, Defendants' Motion.

[29]Exhibit 1, Resp. to Plaintiff's Request for Admission # 1-2, Plaintiff's Response.

[30]Exhibit 78, Reilly Dep. p. 106, Plaintiff's Response.

[31]Exhibit HH, Reilly Dep. p. 122, Defendants' Motion.

[32]Commander Reilly testified that it is possible that he wrote the IDC on February 6, 2004, and backdated it.

[33]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

ordered to contact Plaintiff.[34]  He stated that between 3:10 p.m. and 5:02 p.m., he called

Plaintiff's home three times, leaving two messages requesting that Plaintiff contact him.[35]  After

receiving no response, Commander Reilly stated that on February 5, 2004, at about 8:20 a.m., he

left another message at Plaintiff's home.[36]  Commander Reilly reported that at 10:21 a.m., he

went with Sergeant Krokoff to Plaintiff's home, but no one answered the door, so he left a

business card with a message requesting that Plaintiff call him.[37]  Commander Reilly stated that

at 12:01 p.m., Plaintiff called him, and he told Plaintiff that he was relaying an order from Chief

Wolfgang to Plaintiff to report to Commander Reilly's office immediately, and that Plaintiff

responded, "okay, I'm going to call Paul and I'll get back to you," but by 4:00 p.m., Plaintiff had

not contacted him and had failed to report to his office.[38]  Commander Reilly stated that he

received three copies of the termination letter, one to be hand-delivered to Plaintiff, one to be

sent by regular mail, and one to be mailed as certified.[39]  Commander Reilly also stated that he

contacted Plaintiff's attorney, Paul DerOhannesian, at 5:00 p.m. and informed him that he was

ordered to deliver a termination letter to Plaintiff, but Mr. DerOhannesian stated that Plaintiff

was not with him.[40]  Commander Reilly stated that he phoned Plaintiff's home on his way to

---

[34]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[35]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[36]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[37]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[38]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[39]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[40]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

deliver the letter to make sure he was home, and that from their conversation it was apparent that

Plaintiff had been made aware of the termination letter.  Commander Reilly further stated that

Plaintiff told him during the phone conversation that he was "not welcome," but by that time it

was too late to deliver the letter to Plaintiff's attorney or to mail the certified letter.[41]

Also, on February 5, 2004, Chief Wolfgang directed Commander Reilly to prepare an

IDC outlining Plaintiff's SOP violations.[42]  The IDC, dated February 5, 2004, states:

> The following is a list documenting violations of various sections of the
> Albany Police Standard Operating Procedures committed by Commander
> Christian D'Alessandro.
> Violation of Sec. 14.1.17(2 counts, Insubordination) of the Albany Police
> Department Standard Operating Procedures.  On February 5, 2004 I [Commander
> Reilly] informed Commander D'Alessandro that I was relaying an order from you
> [Chief Wolfgang] to him to report to my office immediately.  Commander
> D'Alessandro acknowledged the order by saying "okay, I'm going to call Paul and
> I'll get back to you."  Commander D'Alessandro failed to report to my office as
> ordered.  Commander D'Alessandro was insubordinate when during the interview
> conducted by the Office of Professional standards he was not truthful.
> Violation of Sec. 14.1.01(Unbecoming Conduct) of the Albany Police
> Department Standard Operating Procedures- Commander D'Alessandro did order
> a subordinate officer (Patrolman Robert Schunk) to distribute a flier derogatory in
> nature toward a fellow employee with specific instructions that the discovery of
> this flier was not to come back to him (Commander D'Alessandro).  These actions
> do not reflect favorably on the department or Commander D'Alessandro and has
> brought discredit upon himself and the Albany Police Department.
> Violation of Sec. 14.1.44(Truthfulness) During the interview conducted by
> the Office of Professional Standards Commander D'Alessandro was not truthful.[43]

---

[41]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[42]Exhibit 78, Reilly Dep. p. 146, Plaintiff's Response.

[43]Exhibit 55, List of Violations IDC, Plaintiff's Response.

Plaintiff testified, however, that he was not ordered to report to work on February 5, 2004.[44]  He further testified that he learned of his termination from an inquiry by a reporter.[45]

In his IDC to Chief Wolfgang, Commander Reilly stated that on February 6, 2004, at 9:30 a.m., Commissioner Nielsen ordered him not to deliver the letters until ordered to do so, and on that evening, he was ordered to mail the certified letter and did so.[46]  The termination letter, dated February 5, 2004, states, "The Albany Police Department's Office of Professional Standards has conducted an investigation into alleged wrongdoing and based on the findings of that investigation, your employment with the Albany Police Department is being terminated immediately.[47]

Lying to OPS during an investigation is considered to be an offense that warrants discipline or termination by the APD.[48]   At the time of his termination, Plaintiff did not have an employment contract with the City of Albany and was an at-will employee of the City of Albany.[49]

On February 11, 2004, Officer Jeffery Hyde, Commander Tashjian's nephew, testified before OPS that Officer Schunk showed him the flier and stated that Commander D'Alessandro "gave it to him and asked him to put it up and make sure it never got back" to Commander

---

[44]Exhibit 74, D'Alessandro 50-h Trans. p. 57, Plaintiff's Response.

[45]Exhibit 74, D'Alessandro 50-h Trans. p. 55-56, Plaintiff's Response.

[46]Exhibit 58, Attempted Notifications IDC, Plaintiff's Response.

[47]Exhibit 56, Termination Letter, Plaintiff's Response.

[48]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ 63.

[49]Plaintiff's Response to Defendants' Statement of Material Facts, ¶ ¶ 76, 77.

D'Alessandro.[50]  Officer Hyde stated that Officer Schunk was nervous and told him that he did

not show the flier to anyone else.[51]  On February 11 and 17, 2004, respectively, Officer Michael

Basile and Detective Robert Wise  testified that Officer Schunk approached them with the flier

and told them that Commander D'Alessandro gave him the flier and told him to hang it up, but

they advised Officer Schunk not to hang it up.[52]

Plaintiff notes several "irregularities" that occurred with the investigation.  Specifically,

Plaintiff states that Commander Tashjian reported his problem with the flier to Commissioner

Nielsen, rather than to the deputy chief, his direct supervisor.[53]  Additionally, although

Commander Reilly stated that a confidential report should be created at the conclusion of an

investigation, no report was created.[54]  Furthermore, Plaintiff states that no investigation report

detailing the steps taken in the investigation or property report were generated, although such

documents would typically be found in a case file.[55]  Plaintiff also states that rather than

fingerprinting the flier he allegedly gave to Officer Schunk to distribute, OPS only fingerprinted

the flier in the locker room, and although others admitted handling the flier, only his fingerprint

was recovered.[56]  Plaintiff notes that an investigation report states that two fliers recovered from

---

[50]Exhibit R, Hyde OPS Testimony p. 2, Defendants' Motion.

[51]Exhibit R, Hyde OPS Testimony p. 2, Defendants' Motion.

[52]Exhibit S, Wise OPS Testimony p. 1-2, Defendants' Motion; Exhibit T, Basile OPS Testimony, p. 2, Defendants' Motion.

[53]Exhibit 78, Reilly Dep. p. 60-62, Plaintiff's Response.

[54]Exhibit 78, Reilly Dep. p. 38, Plaintiff's Response.

[55]Exhibit 79, Breen Dep. p. 21-22, Plaintiff's Response.

[56]Exhibit 78, Reilly Dep. p. 80, Plaintiff's Response.

Officer Mahar's mailbox were dusted for fingerprints, with two fingerprints found, but no records regarding these fingerprints were found in the case file.[57]

On March 15, 2004, Defendant Wolfgang made the following verbal statement, and distributed the same in a written statement in a public meeting at Albany City Hall of the City of Albany Common Council:

> In January 2004 it was brought to my attention that an inappropriate flyer was being circulated throughout the Department. The flyer depicted another member of the Command Staff in a less than flattering manner. But worse, in the flyer were very serious allegations, references to actions allegedly committed by the person, actions that would be perceived as criminal and unethical. This flyer was not viewed as a joke by anyone unfortunate enough to see it but rather as a hateful, bias based attack on a member of our Department. In a word, it was criminal, covered under the penal law section of Aggravated Harassment.

> A short time later, it came to our attention that a fine young police officer, a member of our rank and file found himself victimized when he was intimidated and urged to participate in the distribution of the flyer, an act that he refused to do because he too recognized that the action was morally wrong and a violation of the law.

> A thorough investigation into the circumstances surrounding the creation and distribution of this hate document was conducted by the Department's Office of Professional Standards and based on the outcome of that investigation and evidence collected including Commander D'Alessandro's responses to questions, Commander D'Alessandro was terminated.
> . . .
> Incidentally, it has been reported that the Commander only learned of his firing through a media report. I don't believe that to be the case but I am certain that, had he not refused an order to report to work on February 5th, he would have received notification in a face to face meeting with me. Instead, he chose to be insubordinate and, although on suspension but still a member of the Department, he refused to report to work as he was directed to.[58]

---

[57]Exhibit 80, Krokoff Dep. p. 41-42, Plaintiff's Response; Exhibit 39, Investigation Report, Plaintiff's Response.

[58]Exhibit I, Wolfgang Statement, Defendant's Motion.

An article dated March 16, 2004, entitled "Outgoing police chief defends his department," reporting on the Common Council meeting stated:

> For the first time, Wolfgang explained why D'Alessandro was fired in February. He said the commander had urged a young police officer to distribute a flyer with a negative depiction of another member of the command staff, and was terminated after the department's Office of Professional Standards investigated the incident, he said.
> . . .
> Wolfgang also talked about overtime. . . . Wolfgang said D'Alessandro's report was useful, but did not show wrongdoing, and denied that D'Alessandro was punished for writing it. Two years ago the commander was transferred from the investigative branch of the department to patrol because members of the rank-and-file alleged that he was overbearing and had created a hostile work environment, he said.[59]

Another article, entitled "On the Defensive," dated March 18, 2004, stated:

> The chief pulled no punches in justifying the firing of D'Alessandro, saying the flyer he has been accused of creating was a "hateful bias-based attack" that counted as aggravated harassment. He also called the commander "insubordinate" and described his first transfer out of the detective's office as "for his good and the good of the Albany Police Department" due to accusations that he was creating a "hostile work environment."[60]

An article dated March 25, 2004, entitled "The Whole Truth?," stated, "Wolfgang said D'Alessandro was terminated based on the outcome of the investigation into the creation and distribution of a derogatory flier, and emphasized the 'hateful bias-based' nature of the flier."[61]

By letter dated March 25, 2004, Plaintiff demanded a name-clearing hearing in

---

[59]Exhibit 62, March 16, 2004 Article, Plaintiff's Response.

[60]Exhibit 63, March 18, 2004 Article, Plaintiff's Response.

[61]Exhibit N, March 25, 2004 Article, Defendants' Motion.

connection with his termination.[62]  At no time did Defendants offer Plaintiff a name-clearing

hearing.[63]

On May 22, 2004, an article entitled, "Outgoing Albany official to advise police in Haiti,"

stated:

> The termination of a popular police commander, Christian D'Alessandro, fueled
> the outcry. Residents complained that D'Alessandro was being punished for trying
> to bring abuses in the department spending to light; and department officials said
> D'Alessandro had circulated a flier that defamed another commander.
>
> On Friday, Nielsen said D'Alessandro's termination was justified.  "We've
> dismissed people in the past for that very same thing, he said, adding that
> D'Alessandro lied about the flier to the department's Office of Professional
> Standards.  "We expect officers to be truthful when they're questioned by
> Professional Standards," he said.

On July 8, 2004, Plaintiff filed the Complaint in this case.  On July 3, 2007, this Court

granted Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment

retaliation, defamation, and breach of contract claims.  The Court reserved ruling on Defendant's

motion as it related to Plaintiff's due process claim.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is awarded when there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In ruling on a

motion for summary judgment, the district court is required to 'resolve all ambiguities, and credit

all factual inferences that could rationally be drawn, in favor of the party opposing summary

judgment.'"  *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.

---

[62]Exhibit 64, Name-clearing Letter, Plaintiff's Response.

[63]Exhibit 1, Resp. to Plaintiff's Request for Admission # 19, Plaintiff's Response.

2006) (quoting *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir. 2001)).  "A fact is 'material'

for these purposes when it 'might affect the outcome of the suit under governing law."  *Jeffreys*

*v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "An issue of fact is 'genuine' if 'the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*

(quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

 "Assessments of credibility and choices between conflicting versions of the events are

matters for the jury, not for the court on summary judgment."  *Id.* at 553-54.  However, "[t]he

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could *reasonably* find for the plaintiff."  *Id.* at 554

(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986) (emphasis added)).  "To defeat summary judgment, therefore, nonmoving parties must do

more than simply show that there is some metaphysical doubt as to the material facts, and they

may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations

omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence

showing that its version of the events is not wholly fanciful." *Id*.  "Although all inferences must

be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to

preclude the granting of the motion."  *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir. 2007)**.**

## III.  VIOLATION OF DUE PROCESS RIGHTS - LIBERTY INTEREST

 In his Complaint, Plaintiff alleges that he has been stigmatized in violation of the Due

Process Clause of the Fourteenth Amendment of the United States Constitution.  "The

requirements of procedural due process apply only to the deprivation of interests encompassed by

13

the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569-70, 92 S. Ct. 2701, 2705 (1972). "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id*. at 573. "The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons." *Id*. at n.12.

A § 1983 liberty interest claim of this sort is commonly referred to as a "stigma plus" claim. *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir. 2005). "In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma-plus claim." *Segal v. City of New York,* 459 F.3d 207, 212 (2d Cir. 2006). First, the plaintiff must show that the government made stigmatizing statements about him that call into question the plaintiff's good name, reputation, honor, or integrity. *Id.* (internal quotation marks omitted). "In order to be stigmatized enough to be deprived of liberty, a dismissed employee must be accused of something more than unsatisfactory job performance." *Brito v. Diamond,* 796 F. Supp. 754, 757 (S.D.N.Y. 1992). "For example, charges that the employee is guilty of dishonesty or immorality are stigmatizing because they call into question the person's 'good name, reputation, honor, or integrity.'" *Brandt v. Board of Co-op. Educational Services,* 820 F.2d 41, 43 (2d Cir. 1987). "[S]tatements that 'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's

14

continued ability to practice his or her profession' will satisfy the stigma requirement."   *Segal,* 459 F.3d at 212 (citing *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 630-31 (2d Cir. 1996)).

Defendants assert that Plaintiff has failed to demonstrate that the statements "might seriously damage his standing and associations in the community," imposed a "stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities," or significantly impeded his ability to practice his profession.  *Roth,* 408 U.S. at 573.  Defendants state that Plaintiff's allegation that he was stigmatized for approximately one year when other area police departments would not hire him at his then current rank because they were either not hiring or looking for lower ranking officers would not equate to a hindrance on his ability to seek and obtain employment.  Defendants state that the fact that Plaintiff was hired by the Albany County District Attorney as the department's Chief Criminal Investigator at the exact same pay rate as with the APD less than one year after his termination proves that he did not suffer such damage to his standing in the community so as to preclude obtaining meaningful employment. The Court is not persuaded by this argument.

Although Defendants suggest otherwise in their initial briefing, Plaintiff is not required to demonstrate that the statements were sufficiently stigmatizing to foreclose future job opportunities **and** that the statements might seriously damage his standing and associations in his community.  *Brandt*, 820 F.2d at 43 ("A government employee's liberty interest is implicated where the government dismisses him based on charges "that might seriously damage his standing and associations in his community" **or** that might impose "on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.") (emphasis

added).  Rather, "[t]he Court indicated in *Roth* that when a state employee is discharged two constitutionally protected liberty interests might be implicated."  *Baden v. Koch*, 799 F.2d 825, 829 (2d Cir. 1986) (citing 408 U.S. at 573-74, 92 S.Ct. at 2707).  "First is the individual's interest in his or her 'good name, reputation, honor, or integrity.' "  *Id.*  "Second is the individual's interest in avoiding 'a stigma or other disability' that forecloses other employment opportunities.  *Id.*  Thus, the Court finds that the allegations of dishonesty sufficiently demonstrate that the government made stigmatizing statements about Plaintiff that call into question the his good name, reputation, honor, or integrity, for summary judgment purposes.

Defendants also assert that Plaintiff's liberty interest is not implicated because their statements are substantially true.  *Flood v. County of Suffolk*, 820 F. Supp. 709, 715 (E.D.N.Y. 1993) (holding that "plaintiff's liberty interest is not implicated where the defamatory statement is substantially true") (citing *Codd v. Velger,* 429 U.S. 624, 628-29, 97 S. Ct. 882, 884-85, 51 L. Ed. 2d 92 (1977) (non-tenured employee is not entitled to a name-clearing hearing where the substantial truth of the statement cannot be contested); *Smith v. Lehman,* 689 F.2d 342, 346 (2d Cir. 1982) (plaintiff's liberty interest claim is without merit where he cannot challenge the substantial accuracy of the charges against him)).  The Court finds the present case distinguishable from those cited by the Plaintiff.

In *Flood*, Defendants allegedly stated that plaintiff "may be involved with drug use and problems with alcohol."  820 F. Supp. at 715.  In that case, Plaintiff admitted using marijuana and cocaine in the past and lending money to a boyfriend so that he could purchase drugs.  *Id.*  Additionally, she stated that both of her parents thought she should drink less, and she "[p]ossibly could have been considered impaired [while driving] 1-2 times" in the previous three

16

months).  *Id*.  Also, in *Codd*, the Court found that "[n]owhere in his pleadings or elsewhere has

respondent affirmatively asserted that the report of the apparent suicide attempt was substantially

false."  429 U.S. at 627.  Additionally, in *Smith*, the Navy terminated the plaintiff's employment

on the grounds that he "falsified an official record" because he stated on his personal history

statement in response to inquiries about prior arrests that "08-01-80 Disorderly conduct . . . Case

dismissed," when in fact one charge against him was dropped, but he was convicted on his plea

of guilty to a charge of disorderly conduct, fined $100, and given a suspended sentence of 15

days.  689 F.2d at 344.  There, the Second Circuit held that the falsehood of his statements was

"uncontrovertibly established by the public record of his conviction," and therefore, he could not

challenge the "substantial accuracy" of the Navy's charges against him.  *Id*. at 346.

Here, Plaintiff did not admit that he lied during the OPS investigation, nor did he admit

that he requested that an inferior officer distribute the flier.  In fact, Plaintiff "unequivocally

stated that he did not task Officer Schunk to distribute the flier,"[64] and no "public record of

conviction" exists to the contrary.  Furthermore, Plaintiff disputes that he was insubordinate, as

he testified that he was not ordered to report to work on February 5, 2004, and that he learned of

his termination from an inquiry by a reporter.

Plaintiff is required only "to raise the falsity of these stigmatizing statements as an issue,

not prove they are false."  *Brandt*, 820 F.2d at 43 ("The Supreme Court has required only that a

plaintiff raise the issue of falsity regarding the stigmatizing charges-not prove it-in order to

establish a right to a name-clearing hearing.  Here, Brandt satisfied that requirement by alleging

---

[64]Declaration of Meredith H. Savitt in Opposition to Defendant's Motion for Summary
Judgment, p. 38, Plaintiff's Response.

in his complaint that the charges were false. The truth or falsity of the charges would then be determined at the hearing itself. If Brandt had to prove the falsity of the charges *before* he could obtain a hearing, there would be no need for the hearing.") (citing *Codd,* 429 U.S. at 627, 97 S.Ct. at 883). Here, Plaintiff has raised the falsity of the stigmatizing statements as an issue.

"Second, 'a plaintiff must prove these stigmatizing statements were made public.'" *Segal,* 459 F.3d at 212 (internal quotations omitted). It does not appear that Defendants dispute that the allegedly stigmatizing statements were made in public.

"Third, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment." *Id.* The requirement that both "stigma" and "plus" are sufficiently proximate will be satisfied where "(1) the stigma and plus would, to a reasonable observer, appear connected-for example, due to their order of occurrence," "or their origin," and "(2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Velez,* 401 F.3d at 89 (citing *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 983 (9th Cir. 2002) (finding that the allegedly defamatory statements were made "in the course of" the refusal to rehire the plaintiff when five days after plaintiff's staff privileges were terminated, a report suggesting that plaintiff resigned because he was guilty of the charges levied against him was filed); *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981) ("Any termination occurring in an atmosphere where the plaintiff's reputation is at issue should be considered sufficient to meet *Paul*'s entanglement requirement.").

Defendants contend that Plaintiff's liberty due process rights were not implicated by any statements made regarding his termination because there was no concurrent temporal link

between the Plaintiff's termination and any allegedly stigmatizing statements.  Defendants state

that the general rule is that the defamation "must occur at or near the time of . . . termination."

*Hadley v. County of Du Page*, 715 F.2d 1238, 1246-47 (7th Cir. 1983) ("Thus, '[t]here comes a

point in time when post termination publication of defamation becomes sufficiently remote from

the termination itself so as to make it no longer within the course of termination of employment,'

thereby eviscerating the nexus required by the stigma plus test.").

Defendants state that the Second Circuit has held that "the defamation of a former public

employee *after termination* of the employment relationship does 'not . . . trigger due process

rights.'"  *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993) (emphasis

added) (quoting *Gentile*, 562 F.2d at 198 ("[T]he communication occurred after appellant was

terminated and hence, in the absence of an employment relationship, amounted to at most the

type of simple defamation that the Supreme Court held not to trigger due process rights . . ..").

Therefore, Defendants contend that the statements at issue do not trigger due process rights

because they were made after termination of the employment relationship.

However, in *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004), the Second

Circuit found that although statements at issue "were made *after* plaintiff's termination, . . . we

are nonetheless confident that in this particular situation, where some of the statements were

made within one week of plaintiff's termination, and were made in direct response to requests for

reasons for plaintiff's termination, that the proper nexus exists to demonstrate a deprivation of

plaintiff's liberty interest that is protected by the Due Process Clause." (citing *Gentile,* 562 F.2d

at 198).  Therefore, contrary to the assertion by Defendants, the fact that the statements at issue in

this case were made after Plaintiff's termination does not foreclose the possibility that the proper

19

nexus may exist to demonstrate a deprivation of Plaintiff's liberty interest.

Defendants further state that even if the Court disregards the Second Circuit's holdings in *Patterson* and *Gentile*, the applicable case law indicates that in order for an allegedly stigmatizing statement to successfully attach itself to the adverse governmental action, no more than nine days should separate the two.  *See Martz v. Incorporated Village of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (holding that statements published five months after plaintiff's termination were not made in the "course of dismissal," noting that the statements indicated that the purported malpractice had just recently come to the speaker's attention indicated that it could not have been a factor in the decision not to reappoint her) (citing *Brandt v. Board of Cooperative Educ. Servs.,* 820 F.2d 41, 45 (2d Cir.1987) (where defamatory statements were made at the time of the plaintiff's termination as public school teacher, plaintiff sufficiently alleged deprivation of liberty interest); *Baden v. Koch,* 799 F.2d 825, 831 (2d Cir.1986) (recognizing plaintiff's "weak liberty interest" where alleged defamatory remarks were released concurrently with public announcement of plaintiff's demotion to deputy medical examiner from chief medical examiner); *Gentile v. Wallen,* 562 F.2d 193, 198 (2d Cir.1977) (alleged defamatory statements made after plaintiff had been terminated from employment as public school teacher amounted to "simple defamation" which does not trigger due process rights); *Huntley v. Community Sch. Bd.,* 543 F.2d 979, 985-86 (2d Cir.) (defamatory remarks in public announcement and inclusion of those remarks in plaintiff's employment record at time of termination as school principal sufficient basis for due process claim), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1976)); *Campanelli v. Bockrath,* 100 F.3d 1476 (9th Cir. 1996) (holding that a seven to nine day interval between the termination date and the publication of the

20

defendants' statements setting forth the reasons for the termination did not attenuate the temporal connection between the statements and the termination)).

Defendant Wolfgang made his statement to the City Council approximately six weeks after Plaintiff's termination.  Defendants state that prior to that time, the only statements made by the Defendants regarding the Plaintiff were acknowledging that he was terminated and refusing to comment on the reasons why.  Defendants also state that during this time, there were numerous statements made in the media regarding Plaintiff's termination and the propriety thereof by Plaintiff's counsel and supporters.  Defendants further state that as a direct result of the volume of coverage on the matter, the Albany Common Council directed the Defendants to address the issues surrounding Plaintiff's termination in the hopes of placating Plaintiff's supporters.  Defendants contend that but for the directive by the Albany Common Council to address the issue, Defendants would have remained silent.  Defendants further state that the statements attributed to Defendant Nielsen were not published until May 22, 2004, almost four months after the termination.

Plaintiff asserts that he has clearly met the burden of showing that the stigmatizing statements were made in close temporal relationship to the Plaintiff's dismissal from government employment, as Plaintiff demanded a name-clearing hearing only weeks after his termination.  Plaintiff further asserts that neither he nor his attorney was involved with or present at the Albany Common Council meeting where Defendant Wolfgang spoke.  Plaintiff states that Defendants were under no obligation to speak to the press, and the record does not support any argument that Defendants were obligated to appear before the Albany Common Council, as no subpoena was served.  At the very least, Plaintiffs assert that Defendants could have demanded that the

21

discussion be held in Executive Session, and had no legal obligation to distribute printed copies of Defendant Wolfgang's statements to the press and public, as they did.

The Court can find no bright-line rule as to what amount of time may pass before a termination and statement are too attenuated for purposes of a stigma-plus claim.  Although in *Martz* there was a five month lapse between termination and publication of the statement, the Second Circuit explicitly noted that the statements indicated that the purported malpractice referenced in the statement had just recently come to the speaker's attention, which indicated that it could not have been a factor in the decision not to reappoint her.  Thus, *Martz* is distinguishable from this case in which the statements directly addressed the decision for Plaintiff's termination.

As noted above, the statements attributed to Defendant Nielsen were not published until almost four months after the termination.  *See, e.g., Malapanis v. Regan*, 340 F. Supp. 2d 184, 194 (D. Conn. 2004) (holding that the plaintiffs' stigma-plus claim lacked the necessary temporal nexus when the termination of the contract came approximately four months after the labeling of the plaintiffs as "non-responsible bidders" and approximately three months before the press conference where the allegedly defamatory statements were made); *Cipolla v. County of Rensselaer*, 129 F. Supp. 2d 436, 449 (N.D.N.Y. 2001) (holding that plaintiff's stigma-plus claim lacked the necessary nexus when the allegedly defamatory statements were made six months after plaintiff's termination).  Thus, the Court finds that no jury could reasonably conclude that there was a concurrent temporal link between the statements made by Defendant Nielsen and Plaintiff's termination.  Defendant Wolfgang, on the other hand, made his statement to the City Council approximately six weeks after Plaintiff's termination, and was made in direct response to

22

a request to explain the reasons for Plaintiff's termination.  *See Patterson v. City of Utica,* 370 F.3d 322, 335 (2d Cir. 2004) (holding that the proximity requirement between stigma and plus was met when some statements were made within one week of plaintiff's termination and were made in direct response to requests for reasons for plaintiff's termination).   This is a much closer question.  However, the Court need not decide whether Plaintiff can establish this element.

Even if Plaintiff can sufficiently demonstrated a deprivation of the stigma component of a stigma-plus claim for summary judgment purposes as to Defendant Wolfgang's comments, if Plaintiff received all of the process due to him, Defendants would be entitled to summary judgment.  In evaluating the sufficiency of the procedures afforded the Plaintiff, the Court must consider whether Plaintiff was "given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Patterson*, 370 F.3d at 336.  "The standards by which the constitutionality of such procedures should be measured are well-established."  *Id*.  In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976), "the Supreme Court stated that a three-factor test applies when evaluating the sufficiency of these procedures." *Id*.   "A court must examine: (1) the nature of the interest affected by the official action; (2) the government's interest; and (3) the risk of error and the effect, if any, of additional safeguards."  *Id*.

In *Patterson*, the Second Circuit examined the facts of the case through this framework. 370 F.3d at 336.  As to the first factor, the court noted that a stigma-plus claim requires that "a plaintiff's interest in his reputation be implicated *in connection with* his termination from government employment. This requirement, in conjunction with the requirement for a name-clearing hearing, demonstrates that it is the plaintiff's reputational interest, and how that interest can effect his standing in the community and his future job prospects, that is at issue here."  *Id*.

Regarding the second factor, the court noted "the interest of an executive officer to make and explain important personnel decisions." *Id.* (citing *Baden v. Koch,* 799 F.2d 825, 831 (2d Cir.1986) ("An executive who fails to act when the facts demand action will often be taken to task by the legislature, the media and the public for the continued shortcomings of his subordinates."). As to the third factor, the court stated that "[t]he risk inherent in a stigma-plus claim is the risk that the false charges against the plaintiff will go unrefuted and that his name will remain stigmatized." *Id.*  The same interests and risks apply in this case.

After considering these factors, the Court must determine what process was due to the Plaintiff.  Because Plaintiff's liberty interests were not implicated prior to the public statements made by the Defendants regarding his termination, Plaintiff, as an at will employee, was not entitled to any process prior to the making of those public statements.  Thus, Plaintiff's right to post-termination due process was triggered by the public statements made by the Defendants. Furthermore, any process Plaintiff received before the statements were made to the public, *i.e.* the OPS interview, was not adequate because it did not offer Plaintiff the opportunity to hear and answer first-hand the stigmatizing charges, clear his name of any false statements about him, and cure the injury to his reputation.  In short, Plaintiff could not vindicate a right that was not yet implicated.

Additionally, the Court cannot conclude that any process afforded to Plaintiff during the OPS interview meets the standard of notice and an opportunity to be heard "at a meaningful time and in a meaningful manner."  There is a dispute as to whether Plaintiff received any notice of the charges against him prior to the OPS interview.  Regardless, Plaintiff could not have been aware of the charges that he lied to OPS and was insubordinate (which, according to Defendants,

24

were the reasons Plaintiff was terminated) prior to the OPS interview because those alleged events had not yet transpired.  Also, Plaintiff had no opportunity to confront the sources of the allegations or to produce evidence on his own behalf, as Plaintiff was not present during the interviews of any other witnesses by OPS and did not have the opportunity to question them. Taking the facts in a light most favorable to the non-moving party, the Court finds that the OPS interview could not constitute adequate due process.

Therefore, the Court must determine what process was due to Plaintiff after the statements were made to the public.  Defendants argue that Plaintiff did not avail himself of the available adequate post-deprivation process of an Article 78 name-clearing hearing, and therefore, there has been no constitutional violation.  It appears to be undisputed that Plaintiff did not avail himself of the Article 78 process.

The Second Circuit has stated that where "a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, 'an Article 78 proceeding is a perfectly adequate postdeprivation remedy.'" *Grillo v. New York City Transit Authority*, 291 F.3d 231, 234 (2d Cir. 2002) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880-81 (2d Cir. 1996)).

> Article 78 of the New York Civil Practice Law, an amalgam of the common law writs of certiorari to review, mandamus, and prohibition, provides both a hearing and a means of redress for petitioners. "[A] petitioner in an Article 78 proceeding ... is permitted to submit ... affidavits and other written proof [of their claim], and where a triable issue of fact is raised, the petitioner may obtain a trial." *Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 202 (2d Cir. 1996). Additionally, constitutional issues can be decided in Article 78 proceedings. *Christ the King Reg. High Sch. v. Culvert,* 815 F.2d 219, 224-25 (2d Cir. 1987). An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit. *Hudson v. Palmer,* 468 U.S. at 535, 104 S.Ct. at 3204-05.

25

*Hellenic*, 101 F.3d at 881.  Plaintiff's attempts to distinguish this, and other Second Circuit cases, are not persuasive.

> In *Ryan v. Carroll*, 67 F. Supp. 2d 356, 361 (S.D.N.Y. 1999), the district court stated:
>
> The State of New York provides a dismissed municipal employee with an avenue for clearing her name-a proceeding challenging her termination as arbitrary and capricious and contrary to law pursuant to CPLR Article 78 . It is well settled that the availability of an Article 78 proceeding bars a municipal employee from maintaining a Section 1983 procedural due process claim. The availability of an adequate post-deprivation procedure for reviewing the propriety of the dismissal means that there has been no constitutional violation. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *HANAC v. City of New York,* 101 F.3d 877, 882 (2d Cir.1996). Indeed, Article 78 proceedings have been held to be adequate post-deprivation procedures, and they frequently function as name clearing hearings. *See, e.g., Blum v. Quinones,* 139 A.D.2d 509, 510, 526 N.Y.S.2d 611 (2d Dept.1988); *Merhige v. Copiague School District,* 76 A.D.2d 926, 927, 429 N.Y.S.2d 456 (2d Dept.1980).
>
> Plaintiff argues, citing *Heck v. Humphrey,* 512 U.S. 477, 480, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), that one need not exhaust one's state remedies before commencing a Section 1983 action. But that argument is misdirected. The issue here is whether a due process claim for effecting plaintiff's termination without due process of law exists under 42 U.S.C. § 1983 in the face of an adequate post-deprivation procedure. There is no such claim, because *Heck* did not purport to overrule *Parratt.*

*See also McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 399 (S.D.N.Y. 2005) ("The availability of Article 78 proceedings under New York law bars a municipal employee from maintaining § 1983 procedural due process claim.")  The Court agrees with Defendant that the availability of an Article 78 proceeding to the Plaintiff, which is an adequate post-deprivation procedure and "frequently function as name clearing hearings", means that there has been no constitutional violation.

The Court also notes that Defendants state that Plaintiff was repeatedly asked by the Albany Common Council to testify and release documents that would shed light on his termination, but Plaintiff refused to comply with these requests.  Additionally, Plaintiff clearly had the opportunity to address the allegations against him in the media.  When a public figure has access to the media, a post-deprivation hearing is not necessarily required because the option of calling a press conference to refute any allegations is available.  *Baden v. Koch*, 799 F.2d 825, 831 (2d Cir. 1986) (holding that the utility of a formal name-clearing hearing would be outweighed by the burdens imposed on the government thereby when plaintiff "had already performed the function of such a hearing by refuting the charges against him both privately to his employer and publicly when his written refutations were published along with the statements critical of his performance," and as a public figure at the time of his removal, the plaintiff could "have called a press conference and provided any further defense of his record or explanation of his removal from office that he desired to give").  Therefore, summary judgment is appropriate as to Plaintiff's due process claim.

## CONCLUSION

For the reasons herein stated,

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Docket No. 51) shall be, and it is hereby, GRANTED.  Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE.

Dated this 26th day of February, 2008.

/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE